**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Crim. Action No.: 1:23CR182** |
| **TIMOTHY MARTIN,** | |
| **Defendant.** | |

### MEMORANDUM IN AID OF SENTENCING

Timothy Martin will appear before the Court on October 3, 2025, for sentencing after having been convicted of Injuring an Exhibit and Conspiring to Injure an Exhibit at the National Gallery of Art. The Court is well familiar with the facts of this case having presided over the three-day jury trial. Mr. Martin has reviewed the Pre-Sentence Report (PSR) and, through counsel, respectfully objects to the PSR's guidelines calculation for the reasons explained below.

Mr. Martin has been detained at the D.C. Jail since April 10, 2025, in this case—one week shy of six months. Probation has recommended a sentence of six months. For the reasons that follow, a sentence of time served is sufficient but no greater than necessary to achieve the goals of sentencing.

**I.      Objections to the PSR's Guideline Calculations**

**A.  Because There is No "Sufficiently Analogous" Guideline, the Other § 3553(a) Factors Control.**

The defense objects to the PSR's Offense Level Computation and sentencing guidelines range. First, the PSR erroneously finds that the USSG § 2B1.5 is the most analogous guideline under § 2X1.1. The defense contends there is no sufficiently analogous guideline, so the other provisions of 18 U.S.C. § 3553 control. *See* U.S.S.G. § 2X5.1 & Background.

Courts apply an elements-based approach, like the categorical approach, to determine whether there is a sufficiently analogous guideline. *See United States v. Clark*, 981 F.3d 1154, 1162-64 (10th Cir. 2020). The elements of Mr. Martin's offense are that (1) he injured certain property; (2) within the National Gallery of Art; and (3) did so willfully. Jury Instructions at 26, ECF No. 84. No guideline covers an offense of injuring property, without more. Section 2B1.1 covers theft, destruction, and fraud offenses. Here, there was no theft, no destruction, and no fraud or deceit. Section 2B1.5 covers theft, destruction, fraud, and receipt of special objects of national significance. Here there was no theft, no destruction, no fraud, and no receipt of any object.

The crimes covered by §§ 2B1.1 and 2B1.5 are too dissimilar to the crime of conviction to anchor the Court's sentencing decision and serve as the starting point and "lodestar" for Mr. Martin's sentence. *Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016). Any guidelines range calculated by the Court would not reflect "the Guidelines-writing task" or the § 3553(a) objectives. *Rita v. United States*, 551 U.S. 338, 348 (2007).

Notably, § 2B1.5 was promulgated during the 2001-2002 amendment cycle. *See* Amend. 638 (effective Nov. 1, 2002). Congress promulgated the statute of conviction, 40 U.S.C. § 6303, that same year. *See* Pub. L. 107-217,§ 1, 116 Stat. 1185 (Aug. 21, 2002). Yet the Commission did not index the new statute to any guideline in any future amendment cycle. The Commission easily could have, after notice and opportunity to comment, added the statute to the statutory index.  This suggests that the Commission thought no guideline should apply.

Because no sufficiently analogous guideline, the Court may not calculate and anchor itself with a Guidelines calculation. Instead, the Court must rely on the other § 3553(a) factors, all of which support a time served sentence for Mr. Martin.

II.    **Assuming *Arguendo* There is a "Sufficiently Analogous" Guideline, The Applicable Guidelines Range is 0 to 6 Months.**

   A.    **Section 2B1.1 is the Most Analogous Guideline and Advises a Range of 0 to 6 Months.**

Assuming *arguendo* there is a "sufficiently analogous" guideline, it is § 2B1.1 because the offense is injury to property. Under § 2B1.1(a)(2), the base offense level is 6. The loss did not exceed $6,500, so there is no increase to the offense level under subsection (b)(1) (the loss table). Therefore, the adjusted offense level is 6. After application of § 4C1.1, the total offense level is 4. The guidelines range is 0 to 6 months of imprisonment, and the fine range is $500 to $9,500 (§ 5E1.2).

   B.    **The Cross Reference to § 2B1.5 in § 2B1.1(c)(4) Does Not Apply Because the Offense Did Not "Involve" a "Cultural Heritage Resource."**

The cross-reference to § 2B1.5 in § 2B1.1(c)(4) does not apply because the offense did not "involve" a "cultural heritage resource."

When interpreting a guideline, courts must start with the plain text of the guideline. In *Kisor v. Wilkie*, 588 U.S. 558 (2019), the Supreme Court made clear that courts should only defer to an agency's interpretation of its own rules if the text of the rule itself, after an exhaustion of the typical tools of construction, is genuinely ambiguous. *Id*. at 574. Further, "[i]f genuine ambiguity remains," the agency's reading must be "reasonable," i.e., it must "come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 575-76. And even more, a court must make an "independent inquiry" into the "character and context" of the reasonable interpretations of the rule. *Id.* at 576. In other words, there must be both a genuine ambiguity in an agency's rule and the character and context of an agency's interpretation must fall within the rule's zone of ambiguity before deference is warranted.

*Kisor*'s standard for deference applies to the Sentencing Guidelines. As the Court explained in *Stinson v. United States*, 508 U.S. 36 (1993), the Sentencing Commission "promulgate[d] the guidelines by virtue of an express congressional delegation of authority for rulemaking"—the "equivalent of legislative rules adopted by federal agencies." *Stinson*, 508 U.S. at 45–46. But unlike the Guidelines themselves—and similar to an agency's interpretation of its own rules—the Guidelines commentary is not subject to mandatory congressional review. *Id.* Accordingly, "commentary [should] be treated," and receive the same level of deference as, "an agency's interpretation of its own legislative rule." *Id.* at 45. Moreover, the D.C. Circuit has cautioned against deferring to commentary in situations where the commentary stretches the meaning of the Guidelines beyond their plain text. *United States v. Winstead*, 890 F.3d 1082, 1092 (D.C. Cir. 2018). The current edition of Merriam-Webster defines involve as "to have within or as part of itself" or "to require as a necessary accompaniment." Involve, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/involve (accessed Sept. 15, 2025).[1] The overt act of the conspiracy count was smearing paint on "the exhibit's plexiglass case, base, and surrounding floor." Jury Instructions at 24, ECF 84 (overt act (f)). The substantive offense was injuring an art exhibit's plexiglass case, base, and surrounding floor. The *actus reas* of that substantive offense was causing injury, and there was no injury caused to any art. The offense did not "involve" any object of art because an object of art was not "part of" or "a necessary accompaniment" to the crime of injuring an exhibit.

At co-defendant Smith's sentencing, the Court found that the offense "involved" the Degas sculpture because "everything the defendant said at the time and since makes it crystal clear that

---

[1] In its sentencing memorandum for co-defendant Smith, the government provided the wrong definition of "involve." Gov't Mem. at 10, ECF No. 41. The government provided the definition of the adjective, but the word is used as a verb in this guideline.

it was precisely the cultural significance of the statue displayed in the exhibit and its location in the National Gallery that led to the decision to vandalize that exhibit. And, therefore, the statute [sic] itself was unquestionably involved." Tr. at 10, ECF No. 53. Respectfully, the Court was mistaken. The offense would have been the same regardless of the art object contained in the exhibit and plexiglass case. Section 6303(b)(2) would have been violated even if nothing was in the plexiglass case. The crime of injuring an exhibit in the National Gallery does not in any way depend on the substance or subject of the exhibit. Therefore, the offense did not "involve" the Degas sculpture.

In addition, the exhibit was not a "cultural heritage resource." First of all, the exhibit was not a "resource," within the ordinary meaning of the term "resource." The current edition of Merriam-Webster defines resource as "a: a source of supply or support: an available means —usually used in plural"; "b: a natural source of wealth or revenue —often used in plural"; "c: a natural feature or phenomenon that enhances the quality of human life"; "d: computable wealth —usually used in plural"; and "e: a source of information or expertise." Resource, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/resource (accessed Sept. 18, 2025). A display of a sculpture meets none of these definitions.

Insofar as "cultural heritage resource" may be genuinely ambiguous, the commentary defines it, by way of § 2B1.5 comment. n. 1(v), as "[a]n object of cultural heritage" under 18 U.S.C. § 668(a)(2), which, in turn, is an object that is either over 100 years old and worth over $5,000 or worth at least $100,000.[2] Here, the government has not proven by a preponderance of the evidence

---

[2] Insofar as "cultural heritage resource" may be ambiguous, it unambiguously does not encompass any and all objects worth $100,000 or more. Any such reading is plainly unreasonable.

that the museum exhibit—*i.e.*, having the exhibit in the museum for people to come and see—and/or the plexiglass case, base, and surrounding floor (*i.e.*, the display), meets that definition.

At co-defendant Smith's sentencing, the Court looked to the Sentencing Commission's reasons for promulgating § 2B1.5. Tr. at 12–13. Crucial parts of the Commission's reasoning show that § 2B1.5 does not apply here.

First, the Reason for Amendment states that § 2B1.5 reflects the conclusion that existing economic and property destruction guidelines were inadequate for "crimes involving the theft of, damage to, destruction of, or illicit trafficking in, cultural heritage resources." U.S.S.G. App. C, Amendment 638, Reason for Amendment ("Amend. 638 RFA"). The amendment clearly targeted "the destruction of cultural resources." *Id.* Here, there was no theft of, damage to, destruction of, or illicit trafficking in any cultural resource.

The Reason for Amendment also states that the Guideline is specific to "preservation of cultural heritage *of this nation and its ancestors*." *Id*. (emphasis added). Degas' sculpture is not cultural heritage *of this nation*—it is a French sculpture. The Reason for Amendment specifically refers to American Indians, Alaska Natives, and Native Hawaiian Organizations. *Id*. The Guideline seeks to protect cultural *identity*, reasoning that "individuals, communities, and nations identify themselves through . . . connections to places and objects." *Id.* In discussing the two-level specific offense level relating to a museum, the Commission again referred to "the richness of the *nation's* heritage." *Id*. (emphasis added). The only time the Commission referred to non-American objects, "cultural heritage resources *of foreign provenance*," it referred to statutorily enumerated things "Congress has chosen, in the implementation of international treaties and bilateral agreements." *Id*. ("Cultural property, designated archeological and ethnological material, and pre-Columbian monumental and architectural sculpture and murals are included in the enhancement because these

are cultural heritage resources of foreign provenance for which Congress has chosen, in the implementation of international treaties and bilateral agreements, to impose import restrictions. *See* 19 U.S.C. §§ 2092, 2606, and 2607."). Here, the sculpture at issue plays no part in American cultural or national identity, and it is not subject to import restrictions under the statutes identified. Degas' sculpture, as wonderful and rare and beautiful as it may be, is simply not a "cultural heritage resource."

### C. Assuming *Arguendo* the Cross-Reference to § 2B1.5 Applies, the Guidelines Range is Nevertheless 0 to 6 Months.

Assuming *arguendo* the cross-reference to § 2B1.5 in § 2B1.1(c)(4) applies, the base offense level is 8. The plain meaning of "value of the cultural heritage resource" in the context of this guideline and this case is the value of the museum exhibit to the public for ten days. The value that must be calculated here is the value of the exhibit—what the exhibit is worth to the public, not what the object of art displayed in the exhibit would be worth if it were not a museum exhibit. In other words, what matters is the value of having an exhibit in the National Gallery, regardless of what is displayed.[3]

The exhibit has no monetary value in context. Admission to the museum is free and the museum contained many other exhibits for the public to view during the ten days that this exhibit was not on display, including a substantially identical exhibit located in the same room. Therefore,

---

[3] "Value" is defined as "the monetary worth of something"; "a fair return or equivalent in goods, services, or money for something exchanged"; "relative worth, utility, or importance"; and, as most relevant here, "a numerical quantity that is assigned or is determined by calculation or measurement." Value, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/value (accessed Sept. 19, 2025). The meaning of the word "value" in this guideline is unambiguous. Consequently, there is no need to resort to the commentary, and the commentary is confusing. However, even if the court did look at the commentary, the commentary specifies that the value shall be calculated "*as applicable to the particular resource involved*." U.S.S.G. § 2B1.5 comment. n.2(A) (emphasis added). Here, for the reasons discussed, the value as applicable to the particular resource involved is the value of the museum exhibit to the public.

no adjustment can be made under subsection (b)(1). A two-level adjustment would apply under subsection (b)(2)(F) because the exhibit was in a museum. Therefore, the adjusted offense level would be 10.  After application of §4C1.1, the total offense level would be 8. The guidelines range would be 0 to 6 months the fine range would be $2,000 to $20,000.

At co-defendant Smith's sentencing, the defense did not dispute the government's valuation, and the Court used the value of the Degas sculpture as alleged by the government, reasoning that "there was a deliberate decision by the Commission not to look at the cost of repair or loss when you're talking about art or history or culture." Tr. at 14-15. Respectfully, the Court was mistaken.

First, the Commission explained that "the monetary value of the cultural heritage resource is an important, although *not the sole*, factor in determining the appropriate punishment."Amend. 638 RFA (emphasis added). Here, the alleged monetary value of the art sculpture would be the sole and determinant factor at sentencing under the government and Probation Office's proffered calculations, which would directly conflict with the Commission's intent. Indeed, if the calculations the government posits were correct, then all enhancements that are supposed to raise the base offense level in § 2B1.5 would be completely meaningless because they would not change the range—the range would default to the statutory maximum in every single case. *See* U.S.S.G. § 5G1.1(a) (where the statutory maximum is less than the low end of the guidelines range, the statutory maximum is the guideline sentence). The offense could have been committed for pecuniary gain and motivated by a commercial purpose, U.S.S.G. § 2B1.5(b)(4), and the range would be the same here – 60 months – because the alleged "value" would drive the offense level to double the statutory maximum. Similarly, the guidelines would fail to consider any pattern of misconduct and the use of a dangerous weapon.  *See* U.S.S.G. § 2B1.5(b)(5), (6).

Moreover, for cultural heritage resources covered by § 2B1.5 that are not "archaeological resources," the Commission further explained that it "provided the flexibility for the sentencing court regarding whether and when to use all or some of the methods of valuation, as appropriate, for calculating the total value *associated with the harm to the particular resource caused by the defendant's offense conduct*." Amend. 638 RFA (emphasis added). Thus, the Commission expected courts to use the term "value" in the context of the actual harm caused by the defendant's conduct.[4] Here, Mr. Martin caused no harm to the Degas sculpture. The only possible monetary value of the harm caused was (1) the value of the exhibit to the public for the ten days that it was absent or (2) the cost of cleaning it.

The Probation Office adds 24 levels to the base offense level because the government alleges that the "value" of the exhibit is between $65 and $160 million. This is wrong. First of all, the value of the wax sculpture is irrelevant to the guideline calculation for the reasons discussed. In any event, the fair market value of the sculpture is $0 because it is held in trust and cannot be sold on the fair market. Also, the sculpture lost no value.[5]

---

[4] Notably, the "methods of valuation" proposed by the Commission in the commentary, "commercial value, archaeological value, and the cost of restoration and repair," were "derived from existing federal law," specifically, 16 U.S.C. § 470ee(d) and 43 C.F.R. § 7.14. Amend. 638 RFA. Similarly, the commentary cites 43 C.F.R. § 7.14, 36 C.F.R. § 296.14, 32 C.F.R. § 229.14, and 18 C.F.R. 1312.14(c). None of these provisions involve artwork but, instead, archeological objects. This underscores that § 2B1.5 does not apply here.

[5] Assuming *arguendo* that the fair market value of the sculpture is relevant and that it has a fair market value, the defense disputes that the sculpture's value has a possible $100 million range. It appears that a similar sculpture sold to a private art collector for $44 million in 2022, so the defense would concede that the value of the sculpture, if it could be sold—which it cannot—is at least $44 million. *See* Carlie Porterfield, *Degas' 'Little Dancer' Fetches Record-Breaking $41.6 Million In Auction Of Late Ballet Patron's Art Collection*, Forbes.com (May 12, 2022), https://www.forbes.com/sites/carlieporterfield/2022/05/12/degas-little-dancer-fetches-record-breaking-416-million-in-auction-of-late-ballet-patrons-art-collection/.

The Commission's overall goal with § 2B1.5 was for the court to "determine appropriate and proportionate offense levels in a manner consistent with the overall guidelines structure." Amend. 638 RFA. It would be inappropriate and disproportional to the overall guidelines structure, which relies heavily on statutory minimums and maximums, to calculate the offense level as double the statutory maximum. By establishing a statutory maximum sentence of 60 months, Congress made clear that it did not intend for injury to a plexiglass case to result in imprisonment for over ten years. Commonsense application of the guidelines makes clear that the applicable Guidelines range, if any applies, is 0 to 6 months.

II.    **Application of the Sentencing Factor**s

Regardless of the guideline calculation this Court adopts, the sentencing factors support a sentence of time-served (approximately six months).

**A. Mr. Martin's History and Characteristics**

Timothy Martin was born in 1969 and raised primarily by his mother after his parents divorced when he was three years old. Mr. Martin's childhood was marked by instability: his mother married four times, and with each change came relocations and uncertainty. Despite the lack of consistency in his household, his mother remained a constant, positive presence in his life. Mr. Martin's mother died at age 47 from lung cancer.

From a young age, Mr. Martin displayed intellectual ability, a quality that carried him forward to earn a degree from the University of Florida, where he majored in civil engineering. He later obtained a civil engineering and architecture degrees from North Carolina State University.

Several of Mr. Martin's friends and former colleagues—many who have known him for years— wrote letters to the Court that attest to Mr. Martin's character and skills as an engineer, some excerpts below:

When we worked together, I was consistently struck by the sincerity of his character and the quiet integrity with which he approached every challenge. Our first collaboration was on a LEED-certified project, and I remember how deeply committed Tim was to the principles of sustainability. . . Years later, I hired Tim as a structural engineer for my own home renovation. . . he help[ed] create a safe, beautiful space that reflected the spirt of the home.[6]

Tim volunteered extensively at the public charter school where I taught. His contributions were not only significant in scope but also deeply impactful in shaping the educational environment for both students and teachers.
Tim brought his professional expertise in sustainable architecture and higher education to our school in ways that went far beyond ordinary volunteerism.[7]

I first met Tim in September 2020. He reached out asking to volunteer for Project Pando to help further our work. Tim is incredibly generous with his time and expertise. He has helped water our trees, given lots of helpful advice, used his architectural experience and carpentry to build planting boxes for us, and more.[8]

The letters submitted on Mr. Martin's behalf speak to a skilled, conscientious man who cared deeply about his community and the environment and whose work was informed by this passion for making the world a better place.

Mr. Martin married in 1992. He has two teenaged children. Mr. Martin and his wife divorced in 2020. Prior to his incarceration, Mr. Martin and his ex-wife shared custody of the children. On the weeks that the children were with Mr. Martin, he did all of the things that a dad of teenagers does and them some – he drove them to practices, helped them with their homework, monitored their screen usage, and took them on community service projects. In the words of one friend, "[H]e willingly curtailed his professional career to stay at home and care for his boys for many years. They were his top priority."[9]

---

[6] Letter of Suzy Cash
[7] Letter of Sonja McKay
[8] Letter of Emmanual Brown
[9] Letter of Tina Govan

Counsel acknowledges that it is hard to square the conscientious, quiet man described in the letters with the Mr. Martin's offense conduct. Following the trial, a few of Mr. Martin's long-time friends reached out to undersigned counsel and advised that Mr. Martin suffered from seizures in 2021 after which he underwent brain surgery at the University of North Carolina. Records obtained by the defense confirm that Mr. Martin had a brain surgery to treat arteriovenous malformation (AVM). After the surgery, Mr. Martin recovered at a friend's home and then home alone as COVID restrictions were still in place. During this period of isolation, Mr. Martin became heavily involved in Declare Emergency, a group whose mission is to cause disruption to call attention to the climate crisis. He spent hours on zoom calls with these individuals, discussing the urgent need for action. Notably, many of Mr. Martin's long-time friends relayed that after the seizure and surgery, Mr. Martin's personality changed. While he had always been passionate about the environment, as one friend put it, "his passion seemed to evolve into something more intense."[10] Another friend writes, "[I]n the months after Tim came home from the hospital, I noticed that his behavior started to change. Tim was always the most generous and kind architect and teacher, but after his surgery he became more dogmatic about his understanding of the environment."[11] This friend went on to say that Mr. Martin's offense conduct was "completely at odds with all that I had known Tim to be in the previous 25 years that I had known him."[12]

Counsel is not able to definitively say whether there is a direct link between Mr. Martin's seizures and brain surgery and his offense conduct. It is notable, however, that close friends who have known him for years observed a change in him following the surgery and the isolation that followed. Notwithstanding the potential trauma caused by the seizures and surgery, by all

---

[10] Letter of Julieta Sherk
[11] Letter of Frank Harmon
[12] *Id.*

accounts, Mr. Martin is an intelligent, sensitive, gentle man who cares deeply about his family and his community. This time in jail—away from his children—has caused him to understand that he can never again engage in the conduct that led him before this Court. While he remains passionate about calling attention to the climate crisis, he is committed to finding other, lawful ways to express his well-founded concern about the urgency of the crisis.

### B. The Nature and Circumstances of the Offense

Mr. Martin admitted at trial that he smeared paint on the case around the Little Dancer statue at the National Gallery. The government did not contend that he damaged the statue itself. Mr. Martin admitted that he painted the protective case to draw attention to the climate crisis. Mr. Martin's notion that such action is a legitimate means to call attention to the climate crisis did not arise out of a vacuum. Indeed, "art vandalism"—or superficially damaging works of art—is a well-known phenomenon. Climate protestors around the world have increasingly turned to similar acts in museums as a form of disruptive protest designed to capture attention and spark debate. In 2022, it was reported that 38 environmental protests were staged in museums.[13] These actions—like Mr. Martin's—are not aimed at destroying the art itself, but rather at using highly visible, symbolic targets as platforms for messaging. For example, in 2024, two female activists from the French environmental group Riposte Alimentaire flung pumpkin soup at the glass protecting the Mona Lisa.[14]

Of course, these tactics are controversial and raise the legitimate question whether art is an effective vehicle for protest. Wherever one lands on the debate over whether acts of art vandalism

---

[13] *After 38 attacks on art, climate protestors have fallen into big oil's trap- it's time to change tack,* The Guardian, February 6, 2024.

[14] *How throwing soup at the Mona Lisa can help fight climate change,* Shannon Gibson, Los Angeles Times, February 1, 2024.

constitute an effective form of protest, what is clear is that Mr. Martin's sole intention was to draw attention to the climate crisis. This motivation does not fully excuse his conduct, but it does call for a sentence that is not excessively punitive as his actions were not driven by an intent to permanently damage or destroy property. His aim, however misguided, was to elevate awareness of the climate crisis, not to inflict harm.

### C. Six Months in the D.C. Jail is More Than Sufficient to Meet the Goals of Sentencing

Mr. Martin has been incarcerated in the jail for approximately six months—during this period of time, the jail has been rife with violence, including several stabbings and one murder, and overcrowded due to the surge in arrests and detentions for low-level offenses tied to increased federal law enforcement and the deployment of the National Guard troops in Washington, D.C. Six months in the D.C. Jail constitutes a just punishment for Mr. Martin's conduct. Six months in jail also serves as a sufficient deterrent. Mr. Martin understands that he and his fellow activists must adopt different strategies to call attention to the climate crisis. Importantly, climate protestors have also received the message.

Finally, six months will avoid an unwarranted disparity with the sentence imposed on Joanna Smith, Mr. Martin's co-defendant. Ms. Smith received a sentence of 60 days. A four-month disparity would account for the differences in their two cases. However, any additional time would constitute an unwarranted disparity as they engaged in essentially the same offense conduct.

### III.    Supervised Release is Not Required or Warranted.

The Probation Office asks the Court to impose 36 months of supervision and 16 discretionary conditions of supervised release—13 "Standard Conditions" (PSR at 18-19), and 3 special conditions (PO Sent'g Rec. at 3, ECF 97)—on a 56-year-old first time offender who committed a non-violent property crime causing no permanent property damage and who has no personal

history or characteristics indicating that he needs any type of community services or rehabilitation. This is not reasonable or warranted under the applicable § 3553(a) factors.

Supervised release is not statutorily required here. In considering (1) whether to impose a term of supervised release, (2) the length of the term, and (3) the conditions, the court must consider certain sentencing factors and cannot consider the retributive purposes of sentencing. 18 U.S.C. § 3583(c) (excluding 18 U.S.C. § 3553(a)(2)(A)). "Fines, probation, and imprisonment are a court's primary tools for ensuring that a criminal defendant receives just deserts for the original offense. Supervised release, by contrast, … fulfills rehabilitative ends and provides individuals with postconfinement assistance." *Esteras v. United States*, 145 S. Ct. 2031, 2041 (2025) (cleaned up). "[C]ourts may impose discretionary conditions only after making an individualized assessment of whether they are 'reasonably related' to normal sentencing factors, 18 U.S.C. § 3583(d)(1), and whether they involve 'no greater deprivation of liberty than is reasonably necessary' under the circumstances, *id*. § 3583(d)(2)." *United States v. Matthews*, 54 F.4th 1, 6 (D.C. Cir. 2022); *United States v. Malenya*, 736 F.3d 554, 559 (D.C. Cir. 2013).

Here, 36 months of supervised release, which is 600% the amount of the six-month prison sentence the Probation Office requests, serves no purpose other than retribution and punishment. The Probation Office claims that this length of supervision is necessary to deter Mr. Martin's criminal conduct, protect the public from his further crimes, and to provide restitution to the victims of the offense. PSR at 24. But Mr. Martin has no history of committing criminal conduct to deter, there is no evidence that he will commit further crimes, and the victims of the offense can and would receive restitution regardless of Mr. Martin's supervision status. There is simply no

valid reason to impose any supervised release in this case.[15] If the Court does impose conditions, they must be narrowly tailored. The conditions suggested in the PSR are unwarranted and not individualized narrowly tailored to Mr. Martin.

**Conclusion**

For the reasons herein, the defense respectfully submits that a sentence of time-served is sufficient but no greater than necessary to achieve the goals of sentencing.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER
_____/s/_____
ELIZABETH MULLIN

Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004

---

[15] Insofar as the Court finds it necessary to supervise Mr. Martin's restitution payments—which is not necessary—the term of supervision should be limited to the smallest term necessary to collect payment, and no discretionary conditions of supervision should be imposed because restitution payments are covered by the mandatory conditions of supervision listed in § 3583(d).