# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 23-cr-00182 (ABJ)** |
| **v.** | |
| **TIMOTHY MARTIN,** | |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Mr. Martin is not from our community. In 2023, Mr. Martin left his home in North Carolina and traveled to our community to commit multiple crimes. He planned this with others for months. He planned to block roadways and then throw paint on a priceless and singular art exhibit. He did so with no concern for the repercussions. As a result of his actions, the art exhibit had to be removed from public display for ten days, robbing many, including those traveling from abroad, the opportunity to appreciate this work. His actions deeply impacted the employees of that museum who, to this day, are concerned about repeat attacks. Mr. Martin has expressed no remorse for his actions. To the contrary, during trial, he testified and repeatedly claimed that despite what multiple experts said, he did not and could not have caused any harm. He is wrong. Mr. Martin caused significant harm and is fortunate not to have irreparably damaged a priceless piece of our culture. Mr. Martin has never expressed remorse for his actions.   And he did not commit this crime out of greed or need. Instead, Mr. Martin committed this crime because he believed his political views outweighed anything and anyone else.

For the following reasons, the Government requests that the Court sentence Mr. Martin to five years' imprisonment, followed by two years of supervised release.[1]

---

[1] The Government anticipates filing a Victim Impact Statement from the National Gallery of Art

## BACKGROUND

On April 27, 2023, at approximately 10:45 AM, Mr. Martin and multiple co-conspirators, including Joanna Smith and Donald Zepeda, entered the National Gallery of Art (NGA). Mr. Martin and his accomplices briefly walked around part of NGA before pausing in an alcove adjacent to Gallery 3, where Degas' *Little Dancer Aged Fourteen* is displayed. There, Mr. Martin handed his phone to Mr. Zepeda. During trial, he indicated that he provided his phone to Zepeda so that law enforcement would not seize the phone. Mr. Martin and Ms. Smith then entered Gallery 3. As they entered, other museum goers were admiring the *Little Dancer*.  Martin and Smith paused and waited until the area was clear. Martin and Smith then approached the sculpture, removed bottles filled with black and red paint, and began smearing paint on the exhibit. Mr. Martin used black paint, and Ms. Smith used red paint. As reflected in video, Mr. Martin first smeared black paint on the base of the Exhibit. Then he covered his hand in paint and loudly slapped the side of the case. Paint poured down the side of the case, under the protective case, and down to the floor. Mr. Martin sat on the ground and held up his hands, before joining Ms. Smith in making a statement concerning their offense.

Members of NGA security responded to arrest Mr. Martin. Mr. Martin did not initially comply, refusing to stand, and forcing the officers to drag him away from the Exhibit. As he was pulled away from the Exhibit, Mr. Martin reached out and grabbed at the Exhibit.

Members of Declare Emergency, particularly Mr. Zepeda, filmed the offense and disseminated video of the offense across multiple social media platforms.

This offense was the culmination of a plan by Mr. Martin, Ms. Smith, Mr. Zepeda, and

---

on September 24, 2025.

other members of a group called Declare Emergency. The group had planned this offense for several weeks, describing it as a "Week of Action." Their week of offenses began on Monday, April 24, 2023. During the morning rush hour, members of Declare Emergency arrived at the busy intersection of I-395 and New York Avenue. They sat and blocked the intersection until certain conspirators were arrested and removed from the intersection.

On Wednesday, April 26, 2023, members of Declare Emergency, including Mr. Martin, went to a stretch of the George Washington Parkway, a short distance from Washington, D.C. in Virginia. The conspirators sat and blocked traffic until certain conspirators were arrested and removed from the intersection. While Mr. Martin initially sat in the intersection, he stood and removed himself. As he testified at trial, he wanted to ensure that he could participate in the offense involving NGA the following day.

Prior to entering NGA, Mr. Martin recorded a statement of his intent in committing this offense. Similarly, once he was released from custody, Mr. Martin posted about the event on his social media pages and reached out to reporters and others to describe his actions.

Experts at NGA determined that to repair the Exhibit it had to be removed from public display. As a result, the Exhibit could not be displayed for ten days. The NGA estimated that the cost to repair the Exhibit totaled $4,062. This included the costs for a private contractor to remove and clean the protective vitrine (10 hours of labor costing $680), costs for a private contractor to repaint and re-wrap the base of the Exhibit, and refinish the gallery floor (20 hours of labor costing $1,550), costs for new materials used in the repairs ($200), and costs for a private contractor to safely reinstall the Exhibit (24 hours of labor costing $1,632). This does not include the costs associated with the addition of new security protocols and the necessity for the NGA conservators

to consult on how best to uninstall, move, and repair the Exhibit.

## ARGUMENT

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
> (i) issued by the Sentencing Commission . . .;

4

and
(ii) that, . . . are in effect on the date
the defendant is sentenced; . . .

(5) any pertinent policy statement –
    (A) issued by the Sentencing Commission . . . and
    (B) that, . . . is in effect on the date the defendant is
sentenced.

(6) the need to avoid unwarranted sentence disparities among
defendants with similar records who have been found guilty of
similar conduct; and

(7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven

by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## THE APPLICABLE SENTENCING GUIDELINES

U.S.S.G § 2B1.1 applies to the offense as it involved "Property Damage or Destruction." U.S.S.G § 2B1.1(c)(4) provides that: "if the offense involved a cultural heritage resource or a paleontological resource, apply §2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage Resources or Paleontological Resources; Unlawful Sale, Purchase, Exchange, Transportation, or Receipt of Cultural Heritage Resources or Paleontological Resources)." A "cultural heritage resource" is defined, *inter alia*, as "an object of cultural heritage, as defined in 18 U.S.C. § 668(a)(2)." Section 668(a)(2) in turn defines "object of cultural heritage" as "an object that is . . . over 100 years old and worth in excess of $5,000 . . . or . . . worth at least $100,000." The *Little Dancer* sculpture—which is 141 years' old and has an estimated value of $120 million—qualifies under either. Therefore, the question for the Court is whether this offense "involved" a cultural heritage resource.

The phrase "involved" is not defined in the Guidelines. "In interpreting the Sentencing Guidelines, the Court applies the ordinary tools of statutory interpretation and looks to the plain meaning of its terms." United States v. Seefried, 639 F. Supp. 3d 8, 10 (D.D.C. 2022). See also United States v. Williams, No. CR 21-618 (ABJ), 2024 WL 1239989, at *2 (D.D.C. Mar. 22, 2024) (looking "to the plain meaning of the term at the time the provision was enacted" in interpreting the meaning of a Sentencing Guidelines provision). "To discern the text's plain meaning, courts look to dictionary definitions and analyze the word or phrase in context." Seefried, 639 F. Supp at 10.

Merriam Webster defines "involved" as "having a part in something; included in something." Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/involved (last visited April 17, 2024). The Oxford English Dictionary defines involved as "contained by implication, implicit." Involved, Oxford English Dictionary, https://www.oed.com/dictionary/involved_adj?tab=meaning_and_use#17982 (last visited April 17, 2024).[2] Based on its plain meaning, this offense "involved" the Little Dancer sculpture.

Merriam Webster defines "involved" as "having a part in something; included in something."[2] The Oxford English Dictionary defines involved as "contained by implication, implicit."[3] Based on its plain meaning, Mr. Martin's offense "involved" the *Little Dancer* sculpture.

At trial, the Government proved that Mr. Martin specifically targeted the *Little Dancer*. Indeed, Mr. Martin repeatedly admitted so. He and his co-conspirators conducted research into the sculpture, had at least a cursory understanding of its composition, and made multiple statements both before and after the offense indicating that he had specifically chosen this sculpture for his offense. Prior to the offense, Mr. Martin was recorded outside NGA stating his intent. During that statement, he specifically identified the target of the offense as "a sculpture . . . of a child."  Gov't Trial Ex. 401.3.  Following his releasee, Mr. Martin made a similar statement in which he once again referred to the sculpture *Little Dancer*, stating "the *Little Dancer* is going to be put back tomorrow."  This was not just any case and base. The case contained this specific sculpture and

---

[2] Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/involved (last visited April 17, 2024).

[3] *Involved*, Oxford English Dictionary, https://www.oed.com/dictionary/involved_adj?tab=meaning_and_use#17982 (last visited April 17, 2024)

was chosen for that purpose. In sum, this offense "involved" the *Little Dancer* because it was the essential ingredient animating Mr. Martin's conduct.   Mr. Martin would not have smeared paint on any empty case or base.   And he should not be treated as if he did.

This interpretation is consistent with the broad purpose animating the addition of the Cultural Heritage Resource Guideline. U.S.S.G. § 2B1.5 was added to the Guidelines in 2002. As the Commission stated:

> This amendment reflects the Commission's conclusion that the existing sentencing guidelines for economic and property destruction crimes are inadequate to punish in an appropriate and proportional way the variety of federal crimes involving the theft of, damage to, destruction of, or illicit trafficking in, cultural heritage resources. The Commission has determined that a separate guideline, which specifically recognizes both the federal government's long-standing obligation and role in preserving such resources, and the harm caused to both the nation and its inhabitants when its history is degraded through the destruction of cultural heritage resources, is needed.

638.Amendment, FCJ Federal Sentencing Guidelines Manual Amendment 638 (11/1/13). The Commission further explained: "[t]he higher base offense level represents the Commission's determination that offenses involving cultural heritage resources are more serious because they involve essentially irreplaceable resources and cause intangible harm to society." *Id.*

Mr. Martin has contended that the "cultural heritage resource" guideline does not apply because he neither intended to nor actually harmed the *Little Dancer*.   This Court has repeatedly rejected his argument in similar contexts and should do so here.   Whether the sculpture was harmed is beside the point. The cultural heritage resource guideline does not solely apply to offenses where a cultural heritage resource was harmed or threatened. The Guideline applies to any offense "involving" a cultural heritage resource. If the U.S. Sentencing Commission had intended this guideline to solely apply to offenses where a cultural heritage resource was harmed

or damaged, it easily could have said so. For example, the Commission could have crafted this provision to say: "if the offense *harmed*," "if the offense *damaged*," or even "if the offense *threatened to harm or damage*," a cultural heritage resource. It did not. Instead, it crafted a broader provision consistent with a desire to protect incredibly important cultural objects that included all offenses *involving* such objects.

This interpretation is consistent with the few cases construing this Guideline. In *United States v. Allen*, the Sixth Circuit interpreted this Guideline as applied to the theft of rare books. 516 F.3d 364, 365 (6th Cir. 2008). There, the defendants had conspired to steal rare books from a library. *Id.* The defendants attempted to take seven rare books from the library but were forced to leave two behind given the weight of the books. *Id.* at 368. All seven books were recovered unharmed and undamaged. *Id.* One defendant argued with respect to sentencing that there was no actual loss as all the objects were recovered undamaged. *Id.* at 371. Even though books were recovered unharmed and undamaged, the district court and Sixth Circuit both applied U.S.S.G. § 2B1.5. *Id.* at 376-379. Not only that, the Sixth Circuit found that the district court had erred by limiting its calculation of the offense level to the five books removed from the library and not to all seven that the defendants *attempted* to remove from the library. *Id.* Mr. Green's assertion that he should only be penalized for the actual loss suffered by the Archives and the American taxpayer is completely at odds with this decision.

Moreover, Mr. Martin's assertion that his offense level should be limited to the Archive's restoration and cleanup costs misapplies this Guideline. If the offense "involved" a cultural heritage resource, the offense level is driven by the value of the cultural heritage resource, not solely by the cost of restoration and repair. The Application Notes to U.S.S.G. § 2B1.5 indicate

that value of the resource "shall include": (i) The archaeological value . . . (ii) The commercial value. . . ; (iii) The cost of restoration and repair." U.S.S.G § 2B1.5, Application Note 2. In other words, given the importance of these resources, the Guideline specifically calls for a broader valuation than one solely based on restoration and repair.

In *United States v. Haggerty*, the Fifth Circuit rejected the same argument advanced by Ms. Smith, specifically that the restoration value should control. No. 20-50203, 2021 WL 1827316 (5th Cir. May 7, 2021), *cert. denied*, 142 S. Ct. 759, 211 L. Ed. 2d 475 (2022). There, a defendant had poured red paint on a statue of an American Indian. *Id.* at *1. In sentencing the defendant using § 2B1.5, the court had relied upon the total value of the statute based on its purchase price ($92,000) rather than the repair cost ($1,800). *Id.* at *2. The defendant there argued, as Mr. Green does here, that where a resource "is restored to its prior physical condition, it is error to use the total value of that resource in calculating the offense level under USSG § 2B1.5; rather, the court should use the cost of restoration incurred in bringing the resource back to its prior condition." *Id.* at *9 (internal quotations omitted).

The Fifth Circuit found that this "argument plainly fails." *Id.* The Fifth Circuit found that there was no support in the text of the guideline suggesting that the restoration value should control: "There is nothing that suggests that 'the cost of restoration or repair" takes precedence over and obviates the other two valuations." *Id.* at 304. Further, the Fifth Circuit found that the Sentencing Commission's explanation for the new Guideline further undercut the defendant's arguments: "[T]he Commission makes it clear that the harm that it is concerned about when it comes to the damage and destruction of cultural heritage resources is not purely (or even primarily) the resource's physical condition or monetary value. Rather, the purpose of § 2B1.5 is to provide

10

'flexibility' to appropriately *punish* offenders for both the tangible and *intangible* harm caused by their damage of cultural heritage resources." *Id.* The Fifth Circuit noted that the Commission had expressly elected not to use the concept of "loss," which was generally relied upon in property destruction cases: "The Commission has elected not to use the concept of 'loss,' which is an integral part of the theft, fraud, and property destruction guideline at § 2B1.1, because cultural heritage offenses do not involve the same fungible and compensatory values embodied in 'loss.'" *Id.* at *10. In conclusion, the Fifth Circuit found that the defendant's "argument would have us rewrite the text of § 2B1.5 in tension with the purpose behind its promulgation." *Id.* The Fifth Circuit rejected that invitation. This Court has already rejected this invitation three times with three other defendants. It should do so again.

In essence, Mr. Martin asks this Court to sentence him as if he entered the lobby of a federal building and caused a few thousand dollars of damage to the waiting room. Mr. Martin did not do that. Mr. Martin specifically researched and targeted an incredibly valuable cultural artifact. As such, his offense "involved" a cultural heritage resource, and U.S.S.G. § 2B1.5 applies.

Because U.S.S.G. § 2B1.5 applies, the Government calculates the Sentencing Guidelines as follows:

| Damage to National Gallery of Art Exhibit (40 U.S.C. §§ 6303, 6307) | | |
|---|---|---|
| Base Offense Level | 8 | §2B1.5(a) |
| Value > $3.5M, <$9.5M | +24 | §2B1.5(b)(1), §2B1.1(b)(1)(M) |
| Cultural heritage resource was from a museum | +2 | §2B1.5(b)(2) |
| **Total:** | 34 | |

The Guidelines are the same for the conspiracy and the underlying substantive offense. *See* U.S.S.G. §2X1.1(a)-(c).   Additionally, these offenses group pursuant to §3D1.2(b).   *See*

§3D1.2(b) n.4 ("When one count charges a conspiracy or solicitation and the other charges a substantive offense that was the sole object of the conspiracy or solicitation, the groups will be grouped together.")

Mr. Martin qualifies as a zero-point offender and therefore two levels are subtracted, resulting in a Total Offense Level of 32. Mr. Martin has no scored criminal history, and a Criminal History Category of 0, and therefore a Guidelines Range of 121 to 151 months' imprisonment. The maximum term of imprisonment for a violation of either 18 U.S.C. § 371 or 40 U.S.C. §§ 6303 and 6307 is five years' imprisonment. Therefore, the Guidelines Range is five years' imprisonment. The Guideline range for supervised release is one to three years, U.S.S.G. § 5D1.2(a)(2), and the Guideline range fine is $25,000 to $350,000. U.S.S.G § 5E1.2(c)(3).

**THE GOVERNMENT'S SENTENCING RECOMMENDATION**

The Government recommends that the Court sentence Mr. Martin to the Guidelines sentence of five years' imprisonment, followed by two years of supervised release, with the condition that he continue to stay out of Washington, D.C., and not visit any museum. The Government also requests that Mr. Martin pay restitution in the amount of $4,062. This sentence provides a significant penalty to Mr. Martin, commiserate with the severity of his offenses, his disregard for this Court and its orders, and provides a significant deterrent to those who might imitate his crimes.

I.    **The Nature and Circumstances of Mr. Martin's Offense.**

Mr. Martin's offense merits a significant term of incarceration.

Mr. Martin entered NGA and smeared paint on a priceless art exhibit.   He was not driven by need or greed. He was not driven by any mental or emotional malady. He had planned this act

for months. As he demonstrated at trial, he was clear headed about his actions. His motivations were political. And he believed his political beliefs outweighed anything and anyone else. Mr. Marti and his co-conspirators were not the only visitors to NGA that day. There were tourists, school groups, and members of our community, spending the morning appreciating works of significant cultural and artistic value. There were also dedicated employees at NGA; individuals who spent their days curating and protecting these works. Mr. Martin did not care. Regardless of how it would impact these many other individuals, Mr. Martin believed that his strongly held opinions outweighed it all. Before engaging in this attack, Mr. Martin handed his phone to a confederate. He admitted this was to limit the ability of the Government to investigate this matter. Then, he approached the case of a priceless work of art: Degas' Little Dancer Aged Fourteen. Mr. Martin had spent some time online researching this work of art. He thought he knew how fragile it was. He thought he knew something about how it was constructed.

But there were myriad things Mr. Martin could not know.  Mr. Martin had no idea how light or heavy the case surrounding the sculpture was. He had no idea how touching or moving the case might impact the statute. He had no idea whether the case could easily topple over, destroying the sculpture inside. None of this dissuaded him. He approached this priceless work and recklessly began smearing paint all around the case and base. He did not just smear: he slapped. Smacking the side of the case so hard that NGA conservators winced at trial watching the video of his offense. Mr. Martin ignored the employees and patrons telling him to stop.  He believed that his political message was more important than anyone and anything.

Mr. Martin's conduct causes real harm. It cost approximately $4,062 to repair the case and the base of the Exhibit. His actions closed this Exhibit for ten days. During that time, the hundreds

of individuals who wanted to view this Exhibit could not. Mr. Martin selfishly robbed them of that. And since this offense, it has been difficult for NGA and its employees to return to normalcy. This offense was unprecedented for them. No one has attacked an exhibit like that in NGA before. Moreover, NGA is a museum but also a workplace. And NGA employees no longer feel safe in their workplace. New security measures have been implemented because of Mr. Martin's actions. Employees are now on high alert for future attacks. Mr. Martin has robbed these individuals of the mundane expectation of feeling secure at their workplace.

Mr. Martin has never expressed remorse for his conduct. He did not even bring materials to clean up his mess on the date of the offense. To the contrary, he has never appeared to take any of these proceedings seriously. Even during trial, after hearing multiple NGA employees discuss how upsetting this incident was, the significant harm that Mr. Martin could have caused, and the actual harm Mr. Martin caused, Mr. Martin doubled down. Mr. Martin took the stand and despite what the experts in court said, boldly claimed that he was certain he could not cause any damage. Despite having no relevant experience or training in art conservancy, Mr. Martin explained that his engineering background gave him confidence that his offense was perfectly safe. Mr. Martin has never reflected on his reckless and harmful conduct. He had absolutely no idea the damage he could have done. His stubborn insistence otherwise is simply hubris and reflects that he has not accepted responsibility for his actions.

The nature and circumstances of this offense merit significant punishment.

## II.    <u>Mr. Martin's History and Characteristics.</u>

Mr. Martin has no scored criminal history. He has, however, previously blocked roadways in purported service of his political cause. *See* ECF No. 100 at § 41. He was sentenced to four

days' imprisonment less than a year before committing this offense. That experience did not deter him. To the contrary, his conduct here was a significant escalation.

Mr. Martin's compliance with the Court's conditions of release has been poor, and reflective of how he viewed the seriousness of his conduct. On October 25, 2024, Mr. Martin visited the Baltimore Museum of Art where he posed for a picture in front of a replica of the *Little Dancer*. This was a slap in the face to NGA employees who were sent the photo from individuals at the Baltimore Museum of Art. He was subsequently placed on home detention through the pendency of trial. Following trial, Mr. Martin's conditions of release were revoked after he sketched the courtroom, including jurors, and then contrary to the Court's admonition, allowed that sketch to be uploaded to social media.

Mr. Martin is well-educated, with master's degrees in civil engineering and architecture. While he previously practiced as an architect, he voluntarily stopped working a short time ago. He also has experienced medical trauma and loss. But is difficult to square Mr. Martin's upbringing, education, training, and life with his conduct here. Despite his education, life experience, family and friends, Mr. Martin exhibited a reckless thoughtlessness in his actions. Through the court of litigation and trial he did the same. Mr. Martin came to Washington, D.C., engaged in a senseless and destructive act, and as recently as trial continued to claim that he did not and could not have caused harm.

His history and characteristics provide little mitigation for his conduct. To the contrary, his education and means could have provided him with far better ways to express his views.

### III.    The Need for the Sentence Imposed.

The requested sentence is sufficient but no greater than necessary to meet the goals of

sentencing. Mr. Martin has repeatedly ignored this Court's instructions and demonstrated no remorse or even reflection. A period of specific deterrence is required, which will prevent Mr. Martin from harming our community and others for a period of time. The requested sentence will also provide general deterrence. Since this Court sentenced Declare Emergency member Joanna Smith there has been a significant impact on Declare Emergency "actions." The Court's sentence significantly impacted Declare Emergency's ability to recruit new members and engage in offenses. There has not been an attack since that sentence. Sentencing Mr. Martin to a significant period of incarceration will indicate to any potential new members that their actions are not worth incarceration. These offenses are serious and will result in serious consequences.

Finally, a significant period of incarceration will signal to Mr. Martin that he must reflect on his conduct. He has not previously expressed any remorse. During trial he exhibited nothing but hubris. A period of incarceration will allow him to reflect on his behavior and the harm he caused.

## **CONCLUSION**

For all the foregoing reasons, the Government requests a sentence of five years' imprisonment, followed by two years of supervised release, to include community service, a continued stay-away from Washington, D.C. and museums, and restitution.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Cameron A. Tepfer*
Cameron A. Tepfer
D.C. Bar No. 1660476
Assistant United States Attorney
United States Attorney's Office

601 D. Street, NW
Washington, DC 20579
202-258-3515
Cameron.Tepfer@usdoj.gov